IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| MICHAEL G. FREED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 3:13-CV-592 |
| | ) | |
| CHRISTOPHER DUFFY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by the Defendants, Christopher Duffy and Bradley S. Mazick, Ph.D., on September 13, 2013 (DE 22). For the reasons set forth below, the motion (DE 22) is **GRANTED**, and the clerk is **DIRECTED** to enter judgment in favor of Defendants Christopher Duffy and Bradley S. Mazick.

BACKGROUND

Michael Gene Freed, a *pro se* prisoner, filed this action in June 2013, claiming that he is not receiving adequate medical care for mental health problems. (DE 1.) He was granted leave to proceed solely on a claim for injunctive relief pertaining to his current medical treatment at the Westville Control Unit ("WCU") against Christopher Duffy, an official with Corizon Medical Services, a private company that provides medical care at WCU, and Bradley S.

Mazick, Ph.D., a licensed psychologist at WCU. (DE 6.) The defendants move for summary judgment, arguing that Freed has failed to establish an Eighth Amendment violation in connection with his medical care. (DE 23.) Freed has filed a response to the motion. (DE 26.)

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v.*

*Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the non-moving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Undisputed Facts

Freed, a 25-year old male, arrived at WCU in September 2012 to serve a period of long-term segregation due to behavioral issues. (DE 25-1, Mazick Aff. ¶¶ 4, 6.) When he arrived, he had a history of mental health issues, but did not have a current diagnosis of an "Axis I" mental illness and had not been on psychiatric medication since April 2011. (*Id.* ¶ 6.) According to the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), Axis I disorders are clinical disorders such as depression, bipolar disorder, and schizophrenia, whereas Axis II disorders are developmental disorders and personality disorders, such as Antisocial Personality Disorder. (*Id.* ¶ 5.) Axis I disorders often require treatment with psychiatric medications, whereas Axis II personality disorders do not. (*Id.* ¶¶ 5-6.) In the view of mental health staff at WCU, Freed presents with an Axis II personality disorder and substance abuse issues, not a clinical disorder that requires psychiatric medication. (*Id.* ¶ 5.)

Freed's evaluation and treatment is fully recounted in the medical records. Those records reflect that on September 12, 2012, shortly before his transfer to WCU, he was seen in the segregation unit at Miami Correctional Facility ("MCF") by a mental health clinician, and denied any mental health concerns. (DE 25-3, Medical Records at 20.) He was offered the opportunity to be seen one-on-one, but declined. (*Id.*) He was transferred to WCU later that day, and after his transfer mental health staff at WCU conducted three separate intake interviews on September 12, 2012, September 21, 2012, and October 2, 2012, to determine his need for treatment. (*Id.* at 12-19.)

During those interviews, Freed reported that he had a history of mental health treatment both as an adolescent prior to his incarceration and at a different correctional facility, including prior diagnoses of bipolar disorder, schizophrenia, and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.* at 17.) However, he had not been on any psychiatric medications since April 2011. (DE 25-1, Mazick Aff. ¶ 6.) Freed reported to staff that he had not been bipolar since he stopped the medication. (DE 25-3, Medical Records at 12.) He reported that he still had rage and anger, and that when things did not go his way he would "punch doors," that he sometimes heard voices telling him to hurt others, and that he had caused self-inflicted pain in the past. (*Id.*) He reported an

extensive history of substance abuse dating back to when he was 11 years old. (*Id.* at 13.)

Based upon these interviews and a review of the medical records, mental health staff at WCU determined that Freed did not have an Axis I diagnosis, and that his primary problems were a personality disorder, as well as anger management issues and a lack of coping skills. (*Id.* at 13-15.) It was determined that he had a Global Assessment of Functioning ("GAF") score of 60, which indicates "moderate difficulty" in functioning. (DE 25-1, Mazick Aff. ¶ 7(d).) This was just below a GAF range of 61-70, which would signify only "some difficulty" in functioning. (*Id.*)

On October 24, 2012, Freed requested psychiatric medication during a behavioral health round by mental health staff, but in the clinician's view he did not appear to be having any symptoms of a psychiatric disorder. (DE 25-3, Medical Records at 10-11.) On November 9, 2012, Freed was seen by a counselor after he reported that he sometimes heard voices telling him to hurt people. (*Id.* at 7-9.) He again asked for psychiatric drugs. (*Id.* at 7.) The counselor observed that Freed was loud and irritable during their meeting, but his appearance, behavior, and thought processes were otherwise normal. (*Id.* at 7-8.)

On November 26, 2012, mental health providers reviewed Freed's prior medical records, noting that his prior diagnoses of bipolar disorder and schizophrenia had been fully evaluated in July 2011,

5

January 2012, and January 2013 when he was at MCF. (*Id.* at 5-6.) His then-current mental health code was an "A," meaning staff at MCF determined that he did not have a psychiatric disorder requiring medication. (*Id.* at 6; DE 25-1, Mazick Aff. ¶¶ 6 & 7(g).)

On November 29, 2012, Freed was seen by a counselor, and complained that his diagnosis and medications on the street would be different than what he was receiving at WCU. (*Id.* ¶ 7(h); DE 25-3, Medical Records at 3-4.) He reported that he was feeling stressed about a number of things, including getting "shorted" on lunch trays, dirty showers, and long waits to see the doctor. (DE 25-3, Medical Records at 3-4.) He stated that he sometimes had thoughts about hurting people, and that if he were on the street he would act out on those thoughts. (*Id.* at 3.) Although Freed's mood was anxious and irritable, the counselor observed that his appearance, behavior, and thought processes were otherwise normal. (*Id.* at 3-4.)

On December 17, 2012, Freed was seen by mental health staff during rounds and was observed to be free of psychotic symptoms or other signs of mental illness. (DE 25-1, Mazick Aff. ¶ 7(j).) On December 27, 2012, Freed was seen at his cell and reported that he had no mental health concerns. (DE 25-2, Medical Records at 24.) The clinician noted that Freed was sarcastic during their meeting; in his view Freed's subjective symptom reports and behavior did not

6

indicate an Axis I mental illness, and instead were indicative of Antisocial Personality Disorder. (*Id.*)

On January 8, 2013, a counselor went to Freed's cell, but Freed responded that he had no mental health concerns; Freed later advised that the counselor was coming by too early and that he was very cranky in the mornings. (*Id.* at 23.) The counselor responded that he would come by at a different time of day. (*Id.*) On January 24, 2013, Freed was seen in his cell by a counselor, and stated that he was angry about not receiving recreation and showers, and that he had an urge to hurt the guards. (*Id.* at 21-23.) In the clinician's view, other than Freed's irritable mood, his thought processes, appearance, memory, and affect were normal. (*Id.* at 21.) The counselor discussed coping mechanisms with him, including managing stress and anger levels. (*Id.*) On February 1, 2013, Freed was seen in his cell by a counselor and reported no mental health concerns. (*Id.* at 19-20.) His thought processes, appearance, and mood were observed to be normal. (*Id.* at 19.) On February 3, 2013, Freed reported that he had been sleepwalking. (*Id.* at 18.) He was seen by medical staff for this issue on February 23, 2013. (*Id.* at 16-17.)

On February 28, 2013, Freed was seen by a counselor, during which time he reported having issues with anger. (*Id.* at 14-15.) The counselor attempted to discuss these issues with him but he again stated that he wanted psychiatric drugs. (*Id.*) However, his

7

appearance, affect, and thought processes were observed to be normal. (*Id.* at 14.) On April 1, 2013, Freed was seen in his cell by a counselor. (DE 25-2, Medical Records at 12-13.) He was angry and agitated, and had just been before the disciplinary board for a conduct violation and received another 90 days in segregation. (*Id.*) His thought processes, affect, and appearance were observed to be normal, despite the fact that he was irritable. (*Id.*)

On April 7, 2013, Freed sent a request to the counselor reporting feelings of hopelessness and crying fits. (*Id.* at 11.) He stated that he had not told anyone about this previously because once it would pass he would feel extremely angry, and he also did not want staff or other inmates to know he was crying. (*Id.*) The counselor responded that at their next visit he would pull him out of his cell so they could speak more privately. (*Id.*) On May 3, 2013, the counselor went to Freed's cell, but he refused to be pulled out for a one-on-one meeting; he reported that he did not want to speak to the counselor because he did not think it would do any good.(*Id.* at 9-10.) He reported that he had recently talked to another staff member about participating in a self-help program, through which he could earn a television for good behavior. (*Id.*) The counselor noted that Freed was much less irritable than he had been in the past, and that he had gone 30 or more days without a conduct report. (*Id.*)

On June 12, 2013, Freed was evaluated by Dr. Barbara Eichman, the prison psychiatrist. (DE 25-2, Medical Records at 5-8.) She reviewed his chart from the period of his first incarceration in 2007 to the present. (*Id.* at 5.) She noted that he had been diagnosed with bipolar disorder, schizophrenia, and ADHD as an adolescent, and had been in treatment for several years and had been prescribed several different medications. (*Id.*) She noted that he had been hospitalized three times as an adolescent for aggressive and violent behavior, and that he had an extensive history of substance abuse. (*Id.*) She further noted his social history, family history, and past medical history. (*Id.*) In her view his past problems may have been due to behavior issues fueled by alcohol and drugs, coupled with an abusive family history. (*Id.*) She noted that he had a history of self-injurious behavior, including overdosing on pain medication at MCF in March 2012, which he reportedly did to "feel good." (*Id.*) She reported that at present he had no suicidal or homicidal ideations. (*Id.* at 5-6.) During the interview, his eye contact and affect were good, he was "very appropriate and polite," did not exhibit any mood swings or psychotic symptoms, and his thought processes was logical and sequential. (*Id.* at 5-6.) She noted that he seemed to be responding to the self-help program, and reported to her that he had been working hard to change his behavior. (*Id.*) He reported that his sleep and mood were good. (*Id.*)

Based on her evaluation, Dr. Eichman concluded that at present Freed was not demonstrating signs of depression, mania, or psychotic symptoms. (*Id.* at 7.) She assessed his GAF at 65. (*Id.*) She found no indication of a need for psychotropic medications at that time. (*Id.*) She encouraged Freed to talk with his counselor about any needs or issues he had, and if necessary she or another mental health provider would see him again. (*Id.* at 6.)

On July 2, 2013, Freed asked to speak with a counselor, stating, "I want to talk about something but don't want the range listening." (DE 25-2, Medical Records at 4.) He was told that he would be seen the week of July 8-12. (*Id.*) On July 9, 2013, Freed was seen by a counselor, who reported that he was "calm, pleasant, and conversational." (*Id.* at 2-3.) Freed reported that his television and his participation in the self-help program had given him "something to do." (*Id.* at 2.) He reported some sleep issues, but did not feel that anxiety was the cause. (*Id.*) The counselor observed that he was noticeably less agitated and more cooperative than months earlier. (*Id.*) Freed requested materials on anger and stress management, which were provided. (*Id.*)

On July 30, 2013, Freed was seen in his cell by a counselor and reported no mental health concerns. (*Id.* at 1.) His cell was observed to be "clean and tidy." (*Id.*) Freed continues to be seen at least every 30 days by mental health staff during rounds. (DE 25-1, Mazick Aff. ¶ 7(y).)

Analysis

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). This includes psychiatric disorders. *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 671 (7th Cir. 2012).

On the subjective prong, the plaintiff must establish that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a

decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). "[T]he prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Delaware County Sheriff,* 700 F.3d 1063, 1074 (7th Cir. 2012).

A mere disagreement with medical professionals about the appropriate course of treatment does not establish deliberate indifference, nor does negligence or even medical practice, since "the Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). When an inmate has received some form of treatment for a medical condition, to establish deliberate indifference he must show that the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Id.* Although prisoners are entitled to a minimum level of adequate care, they are not entitled to demand specific medical treatment, nor are they entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see also Maggert v. Hanks*, 131

12

F.3d 670, 671-72 (7th Cir. 1997) ("A prison is not required by the Eighth Amendment to give a prisoner care that is as good as he would receive if he were a free person, let alone an affluent free person.").

Applying those principles here, Freed has failed to establish an Eighth Amendment violation. Assuming his personality disorder and anger management issues constitute a serious medical need, he has not satisfied the second prong, because the record shows that the evaluation and treatment he has received has been adequate and reasonable.

The record reflects that upon his arrival at WCU, he was fully and carefully evaluated by mental health staff to determine whether he was in need of medication or other mental health treatment. (DE 25-3, Medical Records at 12-19.) It was determined by staff, including Dr. Mazick, that Freed had a personality disorder and anger issues, but was not in need of psychotropic medication. (DE 25-1, Mazick Aff. ¶¶ 4-7; DE 25-3, Medical Records at 12-19.) Mental health staff continued to monitor him at regular intervals, and they were responsive whenever he made a specific request to speak with someone about a mental health concern. (DE 25-2, Medical Records at 1-25; DE 25-3, Medical Records at 1-15.) After he continued to express a need for medication, he was seen and fully evaluated by the prison psychiatrist. (DE 25-2, Medical Records at 5-8.) She reviewed all of his mental health records and considered

13

his extensive mental health history, including the fact that other health professionals had diagnosed him with certain disorders and prescribed him medication in the past.[1] (*Id.*) Her notes suggest an alternative view about the possible reasons for Freed's violent past behavior, but in any event she concluded that at present he did not exhibit any symptoms indicating a need for psychiatric medication. (*Id.*)

It is clear from Freed's filings that he disagrees with the defendants' treatment decisions, but his mere disagreement with medical professionals over the proper course of treatment does not establish deliberate indifference. *Arnett*, 658 F.3d at 751; *see also Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013)(prisoner failed to establish Eighth Amendment violation simply because he felt "sure . . . physicians could do better" regarding his care); *Norfleet v. Webster*, 439 F.3d 392, 395-96 (7th Cir. 2006)(difference of opinion over proper treatment did not establish deliberate indifference). In support of his argument that he should be receiving medication, Freed points to his long history

---

[1] Freed asserts that he has been unable to obtain a copy of his medical records from a private hospital that treated him several years ago prior to his incarceration. (DE 28.) It appears he did not follow proper procedures for doing so, and for unknown reasons sent his request to a state court judge rather than to the hospital itself. (DE 28 at 3.) In any event, records from Freed's treatment years ago have little relevance to the issue of his current need for care. To the extent these records are relevant, it is apparent that Dr. Eichman fully considered his mental health history, including his prior diagnoses and his treatment at the hospital he references, in evaluating his present need for care. (*See* DE 25-3, Medical Records at 5-7.) The law permits her to make her own professional judgment about his care, regardless of what another doctor may have concluded in the past. See *Holloway,* 700 F.3d at 1074.

of mental health issues, as well as past incidents during his incarceration when he injured or tried to injure himself. (DE 26.) As stated above, however, the record reflects that mental health staff at WCU were well aware of this information, and considered it in determining whether he had a current need for medication. (*See* DE 25-2, Medical Records at 5-7; DE 25-3, Medical Records at 12-19.) In the view of Dr. Eichman and other mental health professionals at WCU, Freed suffers from a personality disorder and anger management issues, not a clinical disorder requiring medication. (DE 25-2, Medical Records at 5-7; DE 25-1, Mazick Aff. ¶¶ 4-7.) If Freed were a free person and could afford to do so, he might choose to seek out another opinion, in hopes of finding a mental health professional willing to prescribe him medication. However, the Eighth Amendment does not entitle him to demand such care. *See Maggert*, 131 F.3d 671-72; *Forbes*, 112 F.3d at 267. Freed is entitled to adequate care, and as recounted above, the record shows that he received it.

Notably, the record also shows that Freed was recently able to make a marked improvement in his behavior and attitude, without the use of medication, through his participation in a self-help program and his own personal efforts to change his conduct. (*See* DE 25-2, Medical Records at 1-8.) His efforts deserve commendation. However, this further demonstrates that the care Freed has received to date for mental health issues has been reasonable and adequate. Based on

the record, no reasonable jury could find the defendants liable for an Eighth Amendment violation. Accordingly, they are entitled to summary judgment.

CONCLUSION

For the reasons set forth above, the motion for summary judgment (DE 22) is **GRANTED,** and the clerk is **DIRECTED** to enter judgment in favor of Defendants Christopher Duffy and Bradley S. Mazick.

**DATED: December 26, 2013**          **/s/RUDY LOZANO, Judge**
                                      **United States District Court**